IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
NO: 7:05-CR-97-FL-21
NO: 7:08-CV-211-FL

| | | |
|---|---|---|
| ANASTACIO TORIBIO-ASCENCIO | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | **MEMORANDUM AND** |
| v. | ) | **RECOMMENDATION** |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Respondent. | ) | |

_____

This cause comes before the Court on the Government's Motion to Dismiss [DE-758] *pro se* Petitioner's motion under 28 U.S.C. § 2255 to vacate, to set aside, or correct a sentence by a person in federal custody ("Motion to Vacate"). [DE-744]. The undersigned entered a memorandum and recommendation ("M&R") regarding the Government's Motion to Dismiss on March 9, 2009. [DE-764]. Specifically, it was recommended that the Government's motion be granted except with respect to Petitioner's claims that trial counsel was ineffective because counsel:1) failed to file notice of an appeal after a specific request to do so, or, in the alternative, failed to consult with Petitioner regarding an appeal; and 2) grossly misinformed Petitioner about the possibility of deportation when advising him to

1

plead guilty. This recommendation was adopted as the order of this Court on June 4, 2009. [DE-774]. The June 4, 2009 order also instructed the undersigned to conduct an evidentiary hearing on Petitioner's remaining claims. That hearing was conducted on July 6, 2009. Accordingly, this matter is now ripe for disposition.

## Analysis

The circumstances leading up to the filing of Petitioner's Motion to Vacate have already been summarized in the March 9, 2009 M & R. [DE-764, pg. 1-2]. Petitioner's remaining claims shall now be addressed.

### Failure of counsel to file a notice of appeal and/or consult

Michael R. Ramos represented Petitioner at trial. Petitioner argues that Mr. Ramos was ineffective because he "failed to consult with [him] as to an appeal . . . ." [DE-744-2, p. 11]. The Fourth Circuit has held that an attorney's failure to file a notice of appeal, despite a specific instruction from his client to do so, constitutes ineffective assistance of counsel regardless of the likelihood of success on the merits. United States v. Peak, 992 F.2d 39, 42 (4th Cir. 1993). Moreover, even when a criminal defendant has not specifically instructed his attorney to file an appeal, "counsel is [still] under a professional obligation to 'consult' with the defendant regarding that fundamental decision, unless the circumstances demonstrate that consultation is unnecessary." Frazer v. South Carolina, 430 F.3d 696, 707 (4th Cir. 2005) (citing Roe v. Flores-Ortega 528 U.S. 470, 478 (2000)). In Flores-Ortega, the Supreme Court emphasized that it "employ[ed] the term 'consult' to convey a specific meaning--advising the defendant about the advantages and disadvantages of taking an appeal,

2

and making a reasonable effort to discover the defendant's wishes." Id. at 478. "[C]ounsel has a constitutionally imposed duty to consult with the defendant about an appeal when there is reason to think either (1) that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing." Flores-Ortega, 528 U.S. at 480.

Here, Petitioner's testimony clearly indicates that he did not instruct Mr. Ramos to file an appeal. Specifically, Petitioner testified that:

> Q Did you request that an appeal be filed on your behalf by Mr. Ramos or not?
>
> [Petitioner] No, I didn't ask it . . .
>
> . . .Q Did you ever ask Mr. Ramos to file that appeal for you?
>
> [Petitioner] I didn't ask it because I didn't know that I was going to be deported.
> (Tr. 9-10).

In addition, Mr. Ramos testified:

> Q Did [Petitioner] at any time prior to or at sentencing raise the issue of an appeal to you or specifically ask you to file an appeal on his behalf?
>
> [Mr. Ramos] Not that I recall.
>
> Q Do you recall [Petitioner] ever requesting that you appeal or not appeal during the course of the sentencing?
>
> [Mr. Ramos] I don't recall him ever asking to appeal.

Based on this testimony, the undersigned finds that Petitioner did not specifically request Mr. Ramos to file a notice of appeal.

3

Even absent a specific request, Mr. Ramos counsel was still under a professional obligation to consult with the Petitioner regarding a potential appeal unless the circumstances demonstrated that consultation was unnecessary. Frazer, 430 F.3d at 70. Mr. Ramos indicated that:

> My practice is that after the sentence is pronounced, that I will talk to the client, ask them if they want me to do anything for them, if they have any questions, that type of thing. I would have done the same with [Petitioner].
> (Tr. 16).

However, Mr. Ramos also stated that he did not "remember hearing from [Petitioner] after sentencing." (Tr. 16). Likewise, he also testified:

> Q . . . With respect to your discussion with [Petitioner] about his appellate rights, did any of those take place after he was sentenced?
>
> [Mr. Ramos]: Not that I recall. And again, I would have met with him briefly and asked him if he had any questions about what happened and about the proceedings, but I don't recall any specific conversation about appealing.
> (Tr. 18).

Based on this testimony, the undersigned finds that Mr. Ramos failed to consult with Petitioner regarding a potential appeal. Thus, it must be determined whether consultation was necessary under the circumstances.

Consultation is required if there is reason to think that: 1) a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal); or 2) this particular defendant reasonably demonstrated to counsel that he was interested in appealing. Flores-Ortega, 528 U.S. at 480. Neither of these factors are present in this case.

First, Mr. Ramos indicated:

4

> Q As of the date [Petitioner] was sentenced, did you feel that there were any appealable issues?
>
> A No, sir.
>
> Q Had you felt that there were, would you have advised [Petitioner] of such?
>
> A Absolutely . . .
> (Tr. 16).

Indeed, Petitioner's potential nonfrivolous grounds for appeal were reviewed by the undersigned in the March 9, 2009 M & R. [DE-764, pg. 5-11]. Each of these potential claims were deemed meritless. Likewise, Petitioner was sentenced at the bottom of the sentencing guidelines (Tr. 18). Thus, there is no reason to think that a rational defendant would want to appeal.

In addition, Petitioner testified:

> Q Did you request that an appeal be filed on your behalf by Mr. Ramos or not?
>
> [Petitioner] No, I didn't ask it. I asked it when I found out that immigration judge was going to deport me.
>
> Q That was this year; correct?
>
> [Petitioner] I asked the appeal when I found out that the judge was going to deport me.
>
> Q When did you ask for an appeal?
>
> [Petitioner] The first set of papers, I got it November 19 or 17, 2008.
>
> Q Okay. Who did you ask to appeal your case at that point?
>
> [Petitioner] To some friend who was in prison.
>
> Q Did you ever ask Mr. Ramos to file that appeal for you?

> [Petitioner] I didn't ask it because I didn't know that I was going to be deported. And I told the judge that I was not going to appeal if they were not going to deport me.
> (Tr. 9-10).

Based on this testimony, the undersigned finds that Petitioner did not reasonably demonstrate to Mr. Ramos that he was interested in appealing.

Finally, the Supreme Court has held:

> Although not determinative, a highly relevant factor in this inquiry will be whether the conviction follows a trial or a guilty plea, both because a guilty plea reduces the scope of potentially appealable issues and because such a plea may indicate that the defendant seeks an end to judicial proceedings. Even in cases when the defendant pleads guilty, the court must consider such factors as whether the defendant received the sentence bargained for as part of the plea and whether the plea expressly reserved or waived some or all appeal rights. Only by considering all relevant factors in a given case can a court properly determine whether a rational defendant would have desired an appeal or that the particular defendant sufficiently demonstrated to counsel an interest in an appeal.
> [Flores-Ortega, 528 U.S. at 480](#).

In the instant matter, Petitioner both pled guilty and waived his appellate rights. [DE-343]. This further indicates that consultation was not necessary.

Based on these factors, the undersigned HEREBY RECOMMENDS that the Government's Motion to Dismiss [DE-758] be GRANTED with respect to Petitioner's claim that Mr. Ramos: 1) failed to file notice of an appeal after a specific request to do so; or 2) was required to consult with Petitioner regarding the filing of an appeal.

**Counsel's advise to Petitioner regarding deportation**

Petitioner asserts that Mr. Ramos was ineffective because he assured him that if he plead guilty, he would not be deported. [DE-744-2, p. 2, 10]; [DE-759, p. 2]. Specifically,

6

Petitioner contends that Mr. Ramos: 1) failed to make the proper investigation regarding the deportation issue; 2) did not review immigration law "before making such [sic] assurance"; and 3) failed to incorporate the deportation issue into the plea agreement as told to Petitioner. [DE-759, p. 2].

The Fourth Circuit has recognized that "[f]or a guilty plea to be constitutionally valid, a defendant must be made aware of all the 'direct,' but not the 'collateral' consequences of his plea." Meyer v. Branker, 506 F.3d 358, 367-68 (4th Cir. 2007) (citing Cuthrell v. Director, Patuxent Institution, 475 F.2d 1364, 1365 (4th Cir. 1973)). "Direct" consequences are defined as those that will have a "definite, immediate, and largely automatic effect on the range of the defendant's punishment." Meyer, 506 F.3d at 368 (quoting Cuthrell, 475 F.2d at 1366). Likewise, "a consequence is 'collateral' when it is uncertain or beyond the direct control of the court." Meyer, 506 F.3d at 368. Deportability is a collateral consequence. United States v. Yearwood, 863 F.2d 6, 7-8 (4th Cir. 1988).

Normally, "the failure to inform a defendant about collateral consequences, such as deportability, does not render the guilty plea involuntary." United States v. Al-Hababeh, 72 Fed. Appx. 929, 931 (4th Cir. 2003) (unpublished decision). However, when the defendant inquires about collateral consequences, "he is deprived of his constitutional right to counsel" if counsel "grossly misinforms" the defendant about said consequences, and the defendant relies on this advice. Strader v. Garrison, 611 F.2d 61, 65 (4th Cir. 1979); see also, Ostrander v. Green, 46 F.3d 347, 355 (4th Cir. 1995).

Petitioner asserts that there were "off the record conversations" between him and Mr.

7

Ramos where Mr. Ramos, "assured [him] that he was not going to be deported." [DE-759, p. 4]. In support of this claim, Petitioner testified during the hearing in this matter as follows:

> Q What were you told by Mr. Ramos before you entered your plea about deportation?
>
> A When Mr. Ramos told me -- when Mr. Ramos told me that if I was appointed -- when Mr. Ramos told me, then he told me that the district attorney had said that if I pled guilty, he was not going to deport me . . .
>
> . . . The Court: Sir, the question was, did Mr. Ramos tell you that that promise had been incorporated into the plea agreement?
>
> [Petitioner]: That is what he told me.
> (Tr. 5, 20).

Conversely, Mr. Ramos directly contradicted Petitioner's testimony:

> Q How long have you been practicing criminal law?
>
> A Since 1982.
>
> Q Mr. Ramos, over the course of your years practicing criminal law, have you had the occasion to represent individuals who are either an illegal alien or illegal permanent resident alien?
>
> A Yes, sir.
>
> Q Do you have any idea of approximately how many times you have done so?
>
> A A hundred.
>
> Q In the course of representing someone who is either an illegal alien or illegal permanent resident, do you have a custom by which you advise those individuals as to the immigration consequences of the criminal charges they face?
>
> A Yes, I do.

8

Q What is that?

A I will tell the--when it's obvious that they are not a citizen, through interviews, I determine whether they are legal or illegal. I tell them, I have a practice or custom or routine to tell an illegal alien, someone who has not entered the united states legally, that upon conviction of most offenses, aggravated offenses, or any kind of offense, once they became known, their status becomes known to INC--or maybe ICE now--they are going to be deported. Those with some legal status here, I will tell them that for certain offenses, aggravated offenses, crimes of more turpitude, they are also going to be deported. They may be entitled to some due process, but they will be deported for those kinds of offenses.

Q At what point during the proceeding do you customarily have this conversation with clients?

A Before they enter any kind of plea agreement usually, but it's my practice to meet with my clients many times, not just once or twice before they enter into any kind of plea or we go to trial. And it, you know, it is something that they are very concerned about it, so we'll talk about it normally more than one time.

Q Mr. Ramos, you represented [Petitioner] in his criminal proceedings in 2006 and 2007?

A In federal court, yes.

Q Do you recall what he was charged with?

A It was a drug offense, conspiracy to distribute more than -- the high end conspiracy, a ten year mandatory minimum offense.

Q As best you can recall, what was his citizenship status when you represented him?

A He was a permanent legal resident.

Q Do you recall any discussions that you had with [Petitioner] prior to his entering a guilty plea as to immigration or immigration consequences?

A I knew he was concerned about it because he had -- we had a rather lengthy detention hearing where we actually put on some of his family to persuade the

9

> judge -- the magistrate judge who is not there anymore -- to release him. She did not, but it was a concern of his, and I did talk with him about it. I don't remember the specifics. Of course, it would have been with the aid of an interpreter. I don't recall specifically what I told him, but my practice is to tell them that they are going to be deported.
>
> Q Do you recall ever having told him specifically that he would not be deported were he to enter a guilty plea?
>
> A I would never do that. I did not. I do not remember doing that, and I would not do that . . .
>
>  . . .Q Do you specifically recall there ever being any discussions as to your incorporating the immigration issue into the guilty plea?
>
> A No. We -- you don't do that. We just don't do it. The United States Attorney could not agree to something like that . . .
>
>  . . .The Court: . . . . [Petitioner] stated or testified that he told you through the interpreter at whatever jail he was incarcerated at, pretrial, that -- or you told him that he would not be deported. Did that ever occur?
>
> [Mr. Ramos]: Did I ever tell him that he would not be deported?
>
> The Court: Not be deported. That's correct.
>
> [Mr. Ramos]: I don't recall saying that and I can't believe I would say that, but I don't recall saying it.
> (Tr. 11-14, 19).

The Court resolves this testimonial conflict by finding Mr. Ramos' testimony credible and Petitioner's testimony incredible.

Notably, statements made by a defendant during a hearing to accept a guilty plea are subject to a strong presumption of veracity, and challenges under 28 U.S.C. § 2255 that contradict these statements may generally be dismissed:

> [A] defendant's solemn declarations in open court . . . 'carry a strong

10

> presumption of verity . . . because courts must be able to rely on the defendant's statements made under oath during a properly conducted Rule 11 plea colloquy . . . Indeed, because they do carry such a presumption, they present a formidable barrier in any subsequent collateral proceedings . . . Thus, in the absence of extraordinary circumstances . . . allegations in a § 2255 motion that directly contradict the petitioner's sworn statements made during a properly conducted Rule 11 colloquy are always "palpably incredible" and "patently frivolous or false" . . . Thus, in the absence of extraordinary circumstances, the truth of sworn statements made during a Rule 11 colloquy is conclusively established, and a district court should, without holding an evidentiary hearing, dismiss any § 2255 motion that necessarily relies on allegations that contradict the sworn statements. Otherwise, a primary virtue of Rule 11 colloquies would be eliminated – permitting quick disposition of baseless collateral attacks.
> U.S. v. Lemaster, 403 F.3d 216, 221-222 (4th Cir. 2005)(internal citations and quotations omitted).

Here, all of Petitioner's assertions in support of the instant claim contradict the testimony he provided during his Rule 11 hearing. For example, the memorandum of plea agreement which Petitioner signed states:

> . . . This Memorandum constitutes the full and complete record of the Plea Agreement. There are no other agreements between the parties in addition to or different from the terms herein . . .
> [DE-343, pg. 1].

Likewise, the memorandum of plea agreement contained no representations regarding Petitioner's immigration or deportability status. During his May 1, 2006 Rule 11 hearing Petitioner testified as follows with regard to the memorandum of plea agreement:

> Q . . . have you had time to and have you in fact discussed your case with your attorney, Mr. Ramos?
>
> [Petitioner] Yes, sir.
>
> Q Are you satisfied with Mr. Ramos' advise and counsel to you?

11

> A. Yes . . .
>
> . . . Q . . . I've been handed a document entitled Memorandum of Plea Agreement. It appears to be signed by you, Mr. Ramos, as well as Mr. Ontjes . . . Now in that Plea Agreement, you have agreed to plead guilty to Count One of the Indictment. Now I ask you, Mr. Ascencio, did you have the opportunity to read and discuss this plea agreement with Mr. Ramos, your attorney, before you signed it?
>
> A Yes.
>
> Q Does this plea agreement represent your entire agreement with the U.S. Attorney's Office ?
>
> A Yes. Yes.
>
> Q Has anyone made you any promise that's not in this plea agreement to get you to plead guilty to Count One this afternoon?
>
> A No.
>
> Q Do you understand all the terms, the language, the words, the sentences, even the fancy legal words and phrases used in the plea agreement?
>
> A Yes . . .
>
> . . . .Q Do you understand that if you plead guilty to Count One that that's a serious felony and that you'll lose your valuable civil rights?
>
> A Yes, I'm in agreement.
> [DE-763, pg. 9-12].

During the March 9, 2009 hearing, Petitioner simply indicated that he did not remember the testimony he gave during the Rule 11 hearing. (Tr. 20-24). Based on this record the undersigned finds that Mr. Ramos did not grossly misinform Petitioner regarding the collateral consequences of Petitioner's guilty plea.

As a corollary to his deportation argument, Petitioner contends that "[Judge Flanagan],

12

the prosecutor, the ICE agent present in Court, and his counsel, all agreed that because of [his] resident status, he would not be deported." [DE-759, p. 2].

This argument does not accurately reflect the record. During the sentencing hearing, Judge Flanagan stated: "The Court takes note [that Petitioner] is in this country illegally, and, upon completion of the term of imprisonment, [he'll] be surrendered to a duly authorized immigration official for deportation." [Sent. Tr. p. 8, l. 25, p. 9, ll. 1-3]. In response to this statement, Mr. Ramos interrupted the judge and advised her that Petitioner "is not an illegal alien," but is a "legal permanent resident." [Sent. Tr. p. 9, ll. 10, 12]. To resolve the discrepancy in the record, Judge Flanagan requested that the probation office confirm its records. [Sent. Tr. p. 9, ll. 13-14]. Mr. Ramos repeated his belief that Petitioner was a legal permanent resident, and counsel for the Government then stated, "Your honor, I've just asked the agent. He confirms what defense counsel said, that he believes that he's a legal resident alien." [Sent. Tr. p. 9, ll. 15-17, 18-23]. Finally, the probation officer present during the hearing confirmed: "Your Honor, in the presentence report it is noted on the face sheet that he was a legal permanent resident of the United States." [Sent. Tr. p. 10, ll. 3-5]. Thus, despite Petitioner's assertions to the contrary, the individuals that were present during the hearing did not agree that Petitioner would not be deported. Rather, they agreed that he was not an illegal alien.

However, Petitioner accurately notes that Judge Flanagan did in fact state during the hearing that Petitioner would not be subject to deportation:

The Court: So let me go back and reconfirm. You will not be subject to

13

deportation.
. . . .
The Court: Do you have any questions, Mr. Toribio-Ascencio? I've corrected myself. You're not going to be subject to deportation. But do you have any questions so far.

[Petitioner]: Tell her that I want to know if that's true, what she's saying; that they're not going to take away my papers; that I'm not going to be deported when I'm out?

The Court: It is the Court's understanding, to the best of my knowledge and belief, that you will not be surrendered upon completion of your term of imprisonment to an immigration official.
[Sent. Tr. p. 10, ll. 8-9, 18-25; p. 11, ll. 1-3].

Nonetheless, this pronouncement took place during Petitioner's sentencing, after a valid Rule 11 colloquy had already been conducted. The Fourth Circuit has observed that:

> A guilty plea is "a grave and solemn act," Brady v. United States, 397 U.S. 742, 748, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970), and "is an event of signal significance in a criminal proceeding," Florida v. Nixon, 543 U.S. 175, 187, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004). It "is more than a confession which admits that the accused did various acts; it is itself a conviction; nothing remains but to give judgment and determine punishment." Boykin v. Alabama, 395 U.S. 238, 242, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969). Guilty pleas "are indispensable in the operation of the modern criminal justice system," and the finality of such pleas is a matter of "particular importance." United States v. Dominguez Benitez, 542 U.S. 74, 82-83, 124 S.Ct. 2333, 159 L.Ed.2d 157 (2004).
>
> Consequently, a defendant awaiting sentencing does not have an absolute right to withdraw a guilty plea. United States v. Bowman, 348 F.3d 408, 413 (4th Cir.2003). Rather, Federal Rule of Criminal Procedure 11(d)(2)(B) authorizes the withdrawal of a guilty plea before sentencing only if "the defendant can show a fair and just reason for requesting the withdrawal." Because of "the grim dynamics of plea bargaining, including the prevalence of 'buyer's remorse' among those who have pled," United States v. Torres-Rosario, 447 F.3d 61, 66 (1st Cir.2006), a district court should not interpret Rule 11(d)(2)(B) "to allow a defendant to withdraw a guilty plea 'simply on a lark' after [it] conducts a thorough plea colloquy and has made the requisite

14

findings," United States v. Battle, 499 F.3d 315, 321 (4th Cir.2007), cert. denied, --- U.S. ----, 128 S.Ct. 1121, 169 L.Ed.2d 951 (2008) . . .

. . .In light of the fact that "a properly conducted Rule 11 guilty plea colloquy leaves a defendant with a very limited basis upon which to have his plea withdrawn," we have articulated a list of non-exclusive factors for a district court to consider in deciding a plea withdrawal motion. Bowman, 348 F.3d at 414. Those factors are: (1) whether the defendant has offered credible evidence that his plea was not knowing or not voluntary, (2) whether the defendant has credibly asserted legal innocence, (3) whether there has been a delay between entry of the plea and the filing of the motion, (4) whether the defendant has had close assistance of competent counsel, (5) whether withdrawal will prejudice the government, and (6) whether withdrawal will inconvenience the court and waste judicial resources. Id. The consideration of these factors is not "a rigidly mechanistic test, for the conspicuous fuzziness of [the] operative terms-'fair and just'-precludes such an endeavor." United States v. Sparks, 67 F.3d 1145, 1154 (4th Cir.1995). However, a district court typically should balance these factors, along with any other pertinent information, to reach its decision. See United States v. Faris, 388 F.3d 452, 461 (4th Cir.2004). United States v. Thompson-Riviere, 561 F.3d 345, 347-348 (4th Cir. 2009).

Each of the above mentioned factors weigh against permitting Petitioner to withdraw his guilty plea at this stage of the proceedings. Most importantly, Judge Flanagan's comments clearly did not influence Petitioner's initial decision to plea guilty. Although Petitioner was misinformed about his deportability status at his sentencing hearing, he cannot use this as a basis to attack his guilty plea.

For these reasons, Petitioner's claims regarding the advice he received about his immigration status are meritless.

**Conclusion**

For the aforementioned reasons, it is HEREBY RECOMMENDED that the Government's Motion to Dismiss [DE-758] the remaining claims in Petitioner's Motion to

15

Vacate [DE-744] be GRANTED.

SO RECOMMENDED in Chambers at Raleigh, North Carolina this 15th day of July, 2009.

_____
William A. Webb
U.S. Magistrate Judge